UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                  :
KENNETH M. WATFORD,               :
                                  :
          Petitioner,             :     Civ. No. 19-5471 (NLH)
                                  :
     v.                           :          OPINION
                                  :
SOUTH WOODS STATE PRISON,         :
et al.,                           :
                                  :
          Respondents.            :
_____:

APPEARANCES:

Kenneth M. Watford
290971B/711309
Southern State Correctional Facility
4295 Route 47
Delmont, NJ 08314

     Petitioner Pro se

Jennifer Webb-McRae, Cumberland County Prosecutor
Andre Araujo, Assistant Prosecutor
Cumberland County Prosecutor's Office
115 Vine Street
Bridgeton, NJ 08302

     Counsel for Respondents

HILLMAN, District Judge

     Petitioner Kenneth M. Watford, a prisoner presently

incarcerated at Southern State Correctional Facility in Delmont,

New Jersey is proceeding on a petition for a writ of habeas

corpus under 28 U.S.C. § 2254.  ECF No. 1.  For the reasons

stated below, the petition will be denied.  No certificate of

appealability shall issue.

I. BACKGROUND

This Court, affording the state court's factual determinations the appropriate deference, 28 U.S.C. § 2254(e)(1), reproduces the recitation of the facts as set forth by the New Jersey Superior Court, Appellate Division ("Appellate Division") in its opinion denying Petitioner's direct appeal:

> At approximately 4:00 a.m. on January 1, 2009, Jennifer Denby was driving in the southbound lane of the Maurice River Parkway when she spotted a body on the right side of the road. Denby called the Vineland Police Department and Detective Christopher Ortiz responded. Ortiz checked for a pulse on the body, later identified as Ronald Rollines,[1] and found none. Minutes later, emergency medical services arrived and declared Rollines dead at 4:28 a.m.
>
> Medical Examiner Ian Hood performed an autopsy and found sixteen stab wounds on Rollines' body; most were on his back but there were additional wounds on his upper arms, right thumb, right cheek, neck, and stomach. Several of the wounds had the capacity to be fatal and were delivered with considerable force, penetrating bones and organs. One stab wound severed Rollines' aorta and perforated his heart. Hood determined that the cause of death was the stab wounds, and classified the death as a homicide.
>
> Rollines was defendant's cousin, and lived with defendant in Millville along with defendant's son, defendant's girlfriend, Nikia Ives, and Ives' son and daughter. One week before his death, Rollines moved to Philadelphia and began living with Daniel Stevens and Stevens' girlfriend, Nicole Lawson.
>
> On December 31, 2008, Stevens drove Rollines to defendant's home to collect Rollines' social security

---

[1] The victim's last name appears as both "Rollins" and "Rollines" throughout the record.

disability check, which Rollines later cashed.   After
returning to Philadelphia, Rollines began receiving
calls from defendant.   At some point, Rollines asked
Stevens to speak with defendant and give him directions
to the apartment.   Rollines told Stevens that defendant
had some things that belonged to him.   When defendant
could not find the apartment, Stevens told him to meet
at a nearby bar.

As Stevens and Rollines left Stevens' apartment, they
saw defendant who told Rollines, "I want my fucking
money."  Defendant accused Rollines of taking $800 from
defendant's safe.  As Stevens was about to return to his
apartment to get Lawson, he heard defendant say to
Rollines "let Dan go because you ain't going nowhere."
When Stevens and Lawson left the apartment a few minutes
later, Rollines and defendant were gone.

Lawson confirmed that defendant had been outside the
apartment with Rollines and Stevens that night, and that
later, when she and Stevens returned, Rollines and
defendant were gone.  Lawson called Rollines, but got
no answer.  Lawson then called defendant, who told her
Rollines had taken $800 out of his safe.  Lawson told
defendant that was not possible because Rollines,
Stevens, and Lawson were not at defendant's house long
enough.  Lawson asked to speak with Rollines and spoke
with him on defendant's other phone.   Rollines told
Lawson that he was "around the corner" with defendant.
When Lawson asked what was going on, Rollines replied
that he was being accused of taking $800.  Rollines said
that he would call Lawson back, but never did.  Lawson
tried calling Rollines the following morning but got no
answer.  When Lawson called defendant, he told her that
Rollines "caught a cab to Camden" to go to the home of
his niece, Lanell Rollines.

Lanell Rollines testified that she spoke with Rollines
on the evening of December 31, 2008, but that Rollines
did not visit her on January 1, 2009, and that Rollines
had never been to Camden to see her.

State v. Watford, No. A-2990-11T3, 2016 WL 416557, at *1-2 (N.J.

Super. Ct. App. Div. Feb. 4, 2016).

3

Police executed a search warrant at defendant's home and recovered a pair of men's sneakers. They also seized [a] F-150 [truck] and a burgundy truck.  A drop of Rollines' blood was found on defendant's sneaker, and two small drops of blood were found on the F-150's bedcover.  Ives testified that Rollines received dialysis treatment three times per week and once, when he was living with them, he came home and had a little bit of bleeding from his treatment.  Ives also testified that when Rollines was still living there, he occasionally wore defendant's shoes.

Police traced the location of defendant's two cell phones that evening. Between 12:00 and 1:00 a.m., defendant's phone was pinging off towers near his home; between 1:08 and 1:23 a.m., the phones were moving northbound on Route 55; at 1:23 a.m., the phones were pinging near a Sunoco gas station in Mullica Hill; [a] call made at 1:23 a.m. lasted fifty-two minutes, and pinged off of towers near the Ben Franklin Bridge and, as the call continued until approximately 2:15 a.m., the phone pinged off towers near Stevens' residence; between 2:50 and 3:17 a.m., defendant's phone began moving along Broad Street in Philadelphia and progressed over the Ben Franklin Bridge; a call originating at 3:17 a.m. and ending at 3:28 a.m. showed defendant's phone location along Route 55 with the call ending near Sewell, approximately 21 miles north of where Rollines' body was found.  Analysis of this call revealed that, if the phone was transported southbound toward defendant's home at the same rate of speed that it had been travelling in the call immediately prior, the phone would have passed through the location where Rollines' body was found on the Maurice River Parkway at about 3:47 a.m., fifteen minutes before his body was discovered.

There were no calls between 3:28 and 5:17 a.m., but between 5:17 and 5:51 a.m., the phones were located near defendant's home.

Police obtained surveillance tapes from a Sunoco gas station in Mullica Hill, as well as from the Ben Franklin Bridge, which were introduced at trial.  The gas station tape showed a truck similar in appearance and features to defendant's F-150, pulling in between 1:24 and 1:27

4

a.m.  The bridge tape showed a similar truck driving
across the bridge at approximately 1:45 a.m.

Defendant was brought in for questioning on January 1,
2009, and denied killing Rollines.  He claimed that he
and Rollines never argued over money, and that Rollines
did not owe him money.   Defendant suggested that
Rollines was robbed, and that "the true perpetrator
intended to kill Rollines."  When asked about Rollines'
blood found on his sneaker and his truck, defendant said
Rollines lived with him, had dialysis shunts that bled,
would sometimes wear defendant's sneakers, and had
previously been in defendant's truck. Defendant was
subsequently arrested.

After defendant's arrest, he was held in the Cumberland
County Jail.  A warrant was obtained to intercept and
record defendant's outgoing calls from the jail.  Five
of these calls were played for the jury.

In a call made at 10:40 a.m. on January 4, 2009, between
defendant and his son, defendant stated: "I don't want
nothing but the best for you, man. I'm so sorry I done
let you down again. I done fucked up. I let that fucking
anger get me on."

In a second call made at 1:20 p.m. between defendant and
Ives, defendant stated, "New Year's night, did you—did
you grab me? Did you say 'baby don't go, please?' Did
you do any of that? You didn't do any of that." Ives
responded that she told defendant to get "anger
management," and defendant replied "How come you didn't
help me manage it then?"

. . . .

In a fourth call on January 8, 2009, at 12:48 p.m.
between defendant and Ives, Ives said she did not
understand why the police seized the burgundy truck.
Defendant responded, "I don't understand why they took
the black truck.  Baby, did you tell them when I left
home I was driving the black truck? ... I told them I
drove my car.  They just took it upon themselves to take
both of my fucking trucks."

5

In a fifth call on January 8, 2009, at 8:25 p.m. between
defendant and his brother, defendant indicated that he
did not want Ives to see what he had been doing outside
that night.

Id. at *2-4 (footnotes omitted).

On November 18, 2009, a Cumberland County grand jury

charged Petitioner with first-degree murder, N.J.S.A. §  2C:11-

3(a)(1), (2); third-degree possession of a weapon (a knife) for

an unlawful purpose, N.J.S.A. § 2C:39-4(d); fourth-degree

unlawful possession of a weapon (a knife), N.J.S.A. § 2C:39-

5(d); and third-degree hindering apprehension or prosecution,

N.J.S.A. § 2C:29-3(b)C:5-2.  ECF No. 7-2.  The State dismissed

the hindering charge prior to trial.  ECF No. 7-22 at 1.  The

jury ultimately convicted Petitioner of possession of a weapon

for an unlawful purpose and unlawful possession of a weapon.

ECF No. 7-19.  The jury also convicted him of the lesser

included offense of passion/provocation manslaughter.  Id.

On October 5, 2011, the trial court merged the weapons

convictions and sentenced Petitioner to an extended term of 18

years with an 85% period of parole ineligibility on the

manslaughter charge.  ECF No. 7-22.  Petitioner filed a direct

appeal with the Appellate Division.  ECF No. 7-23.  On July 22,

2013, the Appellate Division remanded to the trial court "for

the limited purpose of DNA testing pursuant to N.J.S.A. 2A:84A-

32a." ECF No. 7-25. The appellate court retained jurisdiction. Id. The trial court issued an order directing testing on August 14, 2013. ECF No. 7-27. "A subsequent mitochondrial DNA test determined that Rollines and defendant 'cannot be excluded as the source' of the hair found in Rollines' hands." Watford, 2016 WL 416557, at *9.[2]

The Appellate Division affirmed Petitioner's convictions and sentence on February 4, 2016. Watford, 2016 WL 416557. Petitioner filed a petition for writ of certification from the New Jersey Supreme Court on February 23, 2016. ECF No. 7-32. The New Jersey Supreme Court denied the petition on May 19, 2016. State v. Watford, 141 A.3 296 (N.J. 2016) (Table); ECF No. 7-34. Petitioner did not seek review from the Supreme Court of the United States.

On July 6, 2016, Petitioner filed a postconviction relief

---

[2] "[C]ertain hair fibers found in Rollines' hands at the crime scene . . . were not presented to the jury. Six items were analyzed by the New Jersey State Police Office of Forensic Science:

• head hair from the victim (item # 2);
• hair recovered from victim's right hand (item # 3);
• hair recovered from victim's left palm (item # 4);
• buccal sample from victim (item # 5);
• head hair from defendant (item # 6); and
• buccal sample from defendant (item # 7)."

Watford, 2016 WL 416557, at *9.

("PCR") petition in the Law Division.  ECF No. 7-35.  He argued that trial counsel was ineffective for failing to request DNA testing of the hairs before trial.  Id. at 4.  He also argued appellate counsel was ineffective for failing to argue that his rights were violated "when defendant/petitioner was forced to stand trial while shackled/tethered to [the] floor" and for failing to communicate with him during direct appeal.  Id.

PCR counsel filed a supplemental brief arguing that remand counsel "was remiss for not seeking to enforce the court's granting of the defendant's motion where the State used a testing method that could not, by its own report, identify a specific individual as the source of the materials."  ECF No. 7-36 at 12.  "Remand counsel was also remiss in not requesting that the skin sample retrieved from the victim's hand also be tested."  Id.  The State agreed to test the skin sample, and "[n]uclear DNA testing of the skin sample attached to the hair found in the victim's hand revealed the skin belonged to the victim."  ECF No. 7 at 9.  See also 19T12:18-21.[3]  The PCR court

---

[3] 1T = Hearing Transcript dated May 31, 2011; ECF No. 7-3.
  2T = Trial Transcript dated June 2, 2011; ECF No. 7-4.
  3T = Trial Transcript dated June 7, 2011; ECF No. 7-5.
  4T = Trial Transcript dated June 8, 2011; ECF No. 7-6.
  5T = Opening Statements Transcript dated June 8, 2011; ECF No.
     7-7.
  6T = Trial Transcript dated June 9, 2011; ECF No. 7-8.
  7T = Trial Transcript dated June 15, 2011; ECF No. 7-9.

conducted oral argument on November 27, 2017 and denied the
petition without an evidentiary hearing.  19T; ECF No. 7-39.

Petitioner filed an appeal on June 19, 2018.  ECF No. 7-40.
According to Petitioner, "[t]he Petitioner's appeal from denial
of PCR was voluntarily withdrawn on or about January 30, 2019."
ECF No. 1 at 5.  He filed his habeas corpus petition on February
13, 2019.  ECF No. 1.  Respondent opposes the petition.[4]

---

8T = Trial Transcript dated June 16, 2011; ECF No. 7-10.
9T = Trial Transcript dated June 21, 2011; ECF No. 7-11.
10T = Trial and Rule 104 Hearing Transcript dated June 22,
     2011; ECF No. 7-12.
11T = Trial Transcript dated June 23, 2011; ECF No. 7-13.
12T = Trial Transcript dated June 28, 2011; ECF No. 7-14.
13T = Trial Transcript dated June 29, 2011; ECF No. 7-15.
14T = Charge Conference Transcript dated June 30, 2011; ECF
     No. 7-16.
15T = Closing Arguments and Jury Charge Transcript dated July
     6, 2011; ECF No. 7-17.
16T = Trial/Verdict Transcript dated July 7, 2011; ECF No. 7-
     18.
17T = Sentencing Transcript dated September 7, 2011; ECF No.
     7-20.
18T = Sentencing Transcript dated October 5, 2011; ECF No. 7-
     21.
19T = PCR Hearing Transcript dated November 27, 2017; ECF No.
     7-38.

[4] Respondent initially disputed Petitioner's assertion that his
PCR appeal had been withdrawn and pointed to papers that were
filed on Petitioner's behalf in the Appellate Division after the
submission of the § 2254 petition.  ECF No. 7 at 5.  Petitioner
responded that he was unaware that "appellate counsel
deliberately disregarded the Petitioner's directive, and without
authorization . . . filed a brief and appendix in support of the
PCR appeal on April 23, 2019."  ECF No. 8 at 5-6.  Petitioner
subsequently provided copies of the Appellate Division's order
dismissing his appeal, No. A-4713-17T3, on June 17, 2019.  ECF

II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254 permits a federal court to entertain a petition for writ of habeas corpus on behalf of a person in state custody, pursuant to the judgment of a state court, "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

With respect to any claim adjudicated on the merits by a state court, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding . . . .

28 U.S.C. § 2254(d).  A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's]

---

No. 9 at 2.

precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).

"[A] state-court decision is an unreasonable application of clearly established [Supreme Court] precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." <u>White v. Woodall</u>, 572 U.S. 415, 426 (2014). "[A]n unreasonable application of federal law," however, "is different from an incorrect application of federal law." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Williams</u>, 529 U.S. at 410).

The Court must presume that the state court's factual findings are correct unless Petitioner has rebutted the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

III. DISCUSSION

Petitioner raises a single claim for this Court's review:

> The trial court abused its discretion where it refused to admit into evidence the Philadelphia police report that supported the Petitioner's claim of third-party guilt. This Error denied the petitioner his state and Federal due process, trial by jury, and fair Trial rights, in violation of the U.S. Constitution amendments VI, VIII and XIV. This Violation requires the court to vacate the Petitioner's conviction and remand for a new Trial.

ECF No. 1 at 21. The Appellate Division rejected this claim on direct appeal. <u>See</u> <u>Watford</u>, 2016 WL 416557, at *9 ("We find the remaining arguments raised by defendant in his pro se brief lack

sufficient merit to warrant further discussion in our opinion."). "In considering a § 2254 petition, we review the 'last reasoned decision' of the state courts on the petitioner's claims." Simmons v. Beard, 590 F.3d 223, 231–32 (3d Cir. 2009) (quoting Bond v. Beard, 539 F.3d 256, 289–90 (3d Cir. 2008)). Here, the Court "look[s] through" the Appellate Division's summary denial and applies AEDPA's standards to the trial court's determination. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The Court "presume[s] that the unexplained decision adopted the same reasoning." Id.

Petitioner wanted to introduce "an incident report taken by the Philadelphia Police Department wherein Daniel Stevens called in to report Ronald Rollins missing, and specifically told the police that he was last seen getting into a taxi cab." ECF No. 6 at 33. See also id. at 30-31. On direct, Stevens denied seeing Rollines enter a cab on the night in question:

> [Prosecutor]:   [W]hile you're still outside with
>                 [Petitioner] and with Ronnie, you have
>                 that time frame?
>
> [Stevens]:      Yes.
>
> [Prosecutor]:   Did you see Ronnie get in a cab?
>
> [Stevens]:      No.
>
> [Prosecutor]:   Did you hear Ronnie say he was getting in
>                 a cab?

[Stevens]:       No.

[Prosecutor]:  Did you see a cab in the area?

[Stevens]:       No.

7T50:6-16.  The trial court read the report into the record

outside of the jury's presence:

> It says, year '08, District 39, 203 Section 1, District
> 35, Vehicle WI, report date 11/09, crime or
> classification MT MONPL, two words and then there's a
> code.  It says time out 5:38 and location 3332 North
> Bouvier Street, date of occurrence 11/4 code, time of
> occurrence 3:00 a.m., complainant Daniel Stevens, age
> 58, race, sex and phone number.  Address, the same
> address that has been relevant to this, 332 North Bouvier
> Street.  And then it says checked founded, report to
> follow no, description of incident and M-C which I
> presume means male caller in police.  And you gentlemen
> can help me if that's wrong.
>
> Then it says complaint and states male below has been
> living with him for about a week, plus is concerned
> because he didn't come home last night.  Complaint
> doesn't know the male very well.  I can't read— nor does
> he know if his family member.  Male was last seen taking
> a cab and then there's a — I can't, I don't understand
> the next little symbol.
>
> . . . .
>
> I can't read one word.  Wanted to report the male missing
> but doesn't fit the criteria.

14T15:22 to 16:20.  See also ECF No. 6 at 30-31.

    Trial counsel was aware of the police report at the time

Stevens testified but decided not to cross-examine Stevens about

the report.  14T11:24 to 12:11.  Instead, trial counsel moved to

admit the report into evidence after the close of witness

testimony under the business records exception to the hearsay rule:

> This is a case where somebody is reporting a missing person and why would — what motivation, what inherent motivation would somebody have to inaccurately report that type of information especially here in this particular case where the declarant [Daniel Stevens] has actually testified in court and has said, look he was concerned with the disappearance of Mr. Rollins. So his statement that's contained within that writing is inherently reliable and, moreover, it's taken in the regular course of business of police business.

14T8:24 to 9:9. See also N.J.R.E. 803(c)(6). Trial counsel argued that the statement could be considered a recorded recollection as well. 14T9:20-24 (citing N.J.R.E. 803(c)(5)). The trial court declined to admit the statement under either hearsay exception:

> I'm troubled that this very important issue was not explored with the person that made it. I don't know how accurate the policeman was in recording this story and I don't know what exactly the witness meant. [Stevens] was here and the jury could have judged that credibility. And if I let this in, it becomes much more important that it may be entitled to.
>
> . . . .
>
> Here what's important is that there was report of Mr. Rollins being missing and whether the declarant said he saw a cab out there or he saw him getting into a cab, he saw him getting into another car, he had no duty to report that correctly. The only way to test his credibility and recollection when he was on the witness stand and that wasn't done. And to take this statement which I don't know how accurately recorded was the policeman without him being subject to examination, I

14

think makes this for this purpose not admissible and
generally not trustworthy . . . .

. . . .

[Rule] 803c5 is because the witness wasn't given an
opportunity to explain it. . . .   [T]he witness was
never asked except tangentially and the witness said
what they said.   And without this being absolutely
reliable, I'm not going to allow it in because then it
magnifies to the jury what could be a mistake.   And I
think it had to be out of the mouth of the witness what
this meant because he did testify he reported the – Mr.
Rollins missing that night.

14T21:5.

"[I]t is not the province of a federal habeas court to
reexamine state-court determinations on state-law questions.  In
conducting habeas review, a federal court is limited to deciding
whether a conviction violated the Constitution, laws, or
treaties of the United States." Estelle v. McGuire, 502 U.S.
62, 67–68 (1991).  See also Lewis v. Jeffers, 497 U.S. 764, 780
(1990) ("[F]ederal habeas corpus relief does not lie for errors
of state law[.]").  The Court limits its review to Petitioner's
argument that "[t]he court's error in ruling that the police
report could not be admitted into evidence prevented this
Petitioner from fully presenting his defense at trial and
deprived the jury of its duty to both review and consider a key
piece of material evidence." ECF No. 8 at 12.

"The Constitution guarantees criminal defendants a
meaningful opportunity to present a complete defense, but we
have also recognized that state and federal rulemakers have
broad latitude under the Constitution to establish rules
excluding evidence from criminal trials." Nevada v. Jackson,
569 U.S. 505, 509 (2013) (cleaned up).  "Such rules do not
abridge an accused's right to present a defense so long as they
are not 'arbitrary' or 'disproportionate to the purposes they
are designed to serve.'" United States v. Scheffer, 523 U.S.
303, 308 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 56
(1987)).  "Moreover, we have found the exclusion of evidence to
be unconstitutionally arbitrary or disproportionate only where
it has infringed upon a weighty interest of the accused." Id.

Petitioner argues the report would have shown "that the
Petitioner was not with the decedent at the time of his death;
and more importantly, that he was killed by someone other than
the Petitioner." ECF No. 1 at 21.  "A police report . . .
prepared in the context of an investigation and recounting
subjective events in a narrative form, is not a document that
fits into any exception to the hearsay rule." State v. Mosley,
179 A.3d 350, 363 (N.J. 2018).  "A police report may be
admissible to prove the fact that certain statements were made
to an officer, but, absent another hearsay exception, not the

truth of those statements." <u>Manata v. Pereira</u>, 93 A.3d 774, 784 (N.J. Super. Ct. App. Div. 2014).  Therefore, the trial court reasonably concluded that Petitioner could not introduce the report as a business record for the purpose that Petitioner wanted to use the report, namely as evidence that Rollines left in a cab on the night in question.

Additionally, the trial court reasonably concluded that the reference to the cab in the report was ambiguous and potentially misleading to the jury.  At trial, Stevens and his girlfriend, Nicole Lawson, denied seeing Rollines leave in a cab.  Lawson testified that she called Petitioner while looking for Rollines, and it was Petitioner who told her that Rollines "caught a cab to Camden."  7T80:5 to 81:2.  Lawson then passed this information to Stevens.  7T81:17-22.  <u>See also</u> 7T51:17-20 (Stevens' testimony that he "heard that" Rollines got into a cab from Lawson).  It was reasonable that the trial court was concerned that the report's reference to a cab would mislead the jury in the absence of any testimony that explained the context.

"State and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial.  Indeed, the exclusion of unreliable evidence is a principal objective of many evidentiary rules."  <u>United States v. Scheffer</u>, 523 U.S.

303, 309 (1998).  The trial court's decision "does not implicate any significant interest of the accused" because the trial court "did not preclude [Petitioner] from introducing any factual evidence" about the missing persons report.  Id. at 316-17.  The trial court only disagreed with Petitioner's stated theories of admissibility.  Trial counsel knew about the report and could have questioned Stevens about the reference to a cab during his testimony but chose not to do so.[5]  Petitioner had the chance to question Stevens about the report's reference to Rollines leaving in a cab, meaning the trial court's decision did not prevent him from presenting his defense to the jury.[6]

Petitioner has not shown that the trial court's decision was contrary to or an unreasonable application of clearly established federal law.  He also has not shown that the decision was based on an unreasonable determination of the facts

---

[5] Trial counsel did show Stevens a different statement that he made to the police on January 1, 2009.  7T57:4.  Trial counsel asked Stevens if he remembered "telling the police that, that you walked up and you looked around and you saw a silver car back off and pull off?"  7T61:14-16.  Stevens responded that he did not remember.  7T61:17.

[6] Petitioner argues that "Mr. Stevens was not the author of the police report, and there is no evidence that he ever saw the police report prior to trial.  Thus, even had Mr. Stevens been shown a copy of the police report, there is nothing that would have authenticated the report through that witness."  ECF No. 8 at 9.  Authenticating a document and having one's recollection refreshed by a document are two separate evidentiary issues.

in light of the evidence at trial.  Accordingly, he is not entitled to federal habeas corpus relief.

IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Thus, no certificate of appealability shall issue.

V.  CONCLUSION

For the above reasons, the Court will deny the petition for writ of habeas corpus.  A certificate of appealability will not issue.  An appropriate Order follows.

Dated:  July 22, 2022                    s/ Noel L. Hillman
At Camden, New Jersey                    NOEL L. HILLMAN, U.S.D.J.